**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| ULTRA GROUP OF COMPANIES, INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-CV-1342-RWS |
| | : | |
| DEKALB COUNTY, GEORGIA; | : | |
| DEKALB COUNTY POLICE | : | |
| CHIEF in his official capacity; and | : | |
| DEKALB COUNTY POLICE | : | |
| OFFICER L. ROSE; DEKALB | : | |
| COUNTY POLICE OFFICER E.I. | : | |
| JONES; AND DEKALB | : | |
| COUNTY OFFICER E. | : | |
| McCOWN, in their individual | : | |
| capacities, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

This case is before the Court on Defendants Officer McCown, Officer

Jones, DeKalb Chief of Police and DeKalb County's ("Moving Defendants")[1]

Motion for Summary Judgment [37].  After reviewing the record and the

Parties' submissions, the Court enters the following Order.

---

[1] Defendant Rose is not named in Moving Defendants' motion.  Therefore, Plaintiff's claims against him are not impacted by this Order.

**Background[2]**

Plaintiff has lease agreements to rent space for coin-operated amusement machines at the S&N Superette/Lotto ("S&N Store"), the Chevron Food Mart ("Chevron Store"), and the Texaco Food Mart ("Texaco Store").  Nizar Damani, Plaintiff's CEO, testified that during the relevant time period, Plaintiff had placed nine amusement machines at the S&N Store, eight machines at the Chevron Store, and nine machines at the Texaco Store.  To play the "touch screen" machines, patrons insert bills into a money acceptor and redeem their winning points with the store operator.

Assistant Police Chief Annette Williams testified that in 2010 and 2011, the DeKalb County Police Department ("DCPD") received numerous complaints about illegal gambling activities at area convenience stores, gas stations, and other establishments.  Captain A.T. Mears, testifying as DeKalb County's 30(b)(6) witness, described the DCPD's process for investigating alleged illegal gambling on amusement machines.  (Mears Depo., [38] at 57 of 70.)  He stated that once an investigation is opened, vice detectives visit the

_____

[2] Unless otherwise noted, the facts are undisputed and are taken from the Parties' respective statements of material facts.

2

alleged illegal gambling location and play the machines or ask an informant to play the machines.  (Id.)  If the detectives or their informants receive a payout over $5.00, they place the payout into evidence and log it in their case notes. (Id.)  If they receive multiple payouts over $5, the detectives prepare a search warrant for the location and arrest warrants for the individuals who paid them. (Id.)  Once a search warrant is issued, the supervising sergeant arranges for execution of the warrant with "uniform presence" from the SWAT team or DCPD officers.  (Id.)  Following execution of the warrant, any evidence collected is secured and inventoried.  (Id.)

The search warrants obtained by the DCPD in this case authorized officers to seize cash from the amusement machines at all three stores.  (Mears Depo., [52-2] at 7 of 38.)  With respect to officers' procedure for collecting money from amusement machines, Captain Mears stated that officers first try to obtain a key from the store clerk.  If the clerk does not have a key, officers contact the store owner and give him a reasonable amount of time to deliver a key.  If a key is not produced by the store owner, officers force open the machines and retrieve the cash.  Sergeant Thomas testified that if officers have

3

to open machines themselves, it is normal practice for Strike Force officers to open them with rams and Halligans.  (Thomas Depo., [52-4] at 9 of 48.)

Captain Mears testified that he does not think officers receive training on using force to open amusement machines, but stated that the protocol – communicated to vice unit officers – is to "be the least invasive just to go in and get the money, the minimum amount of damage possible to make entry." (Mears Depo., [52-2] at 9 of 38.)  He stated that officers "don't try to damage the machine in any way. [They] try to go in the most, the least invasive way to get to the [bills]."  (Id. at 6 of 38.)  When shown a picture of the damage done to a machine in this case, including a missing video screen, Captain Mears testified that he'd "never seen a machine in this state" and would "want to know why we had that amount of damage."  (Id. at 8 of 38.)    Invoices show that $9,815 in damage was done to the S&N Store machines and $13,190 in damage was done to the Texaco Store machines.  ([45-5] Ex.s 6, 7.)  Plaintiff claims that $9,940 in damage was done at the Chevron Store.

Plaintiff does not dispute that receiving cash payouts from winning points constitutes gambling.  Plaintiff admits that at the S&N location, officers were paid cash in excess of $5.00.  (Mears Depo., [38] at 63-64 of 70.)  At the

4

Chevron and Texaco stores, however, officers were paid in items valued at more than $5.00.  (Id.)  Captain Mears testified that it was his understanding, based on DCPD policy, that "if you get something of value from a store of over $5, . . . that was commercial gambling."  (Mears Depo., [52-2] at 14 of 38.)

Defendant McCown, a vice detective, investigated complaints of gambling at the S&N store.  While working undercover, McCown played the amusement machines on several occasions, and on at least two occasions he received cash payouts over $5.00.  He also personally observed an informant play the machines and receive a cash payout.  Relying on evidence he obtained during his investigation, McCown obtained a search warrant from the Magistrate Court for the entire S&N store premises.  The search warrant described the property subject to search as follows: "Computers and related devices, . . . any gambling devices, as defined in O.C.G.A. § 16-12-20(2), including video gambling devices, . . . [and] items of value such as currency or other items such as electronics, vehicles and all items that are subject to forfeiture under Georgia Law . . . ."

On February 19, 2011, DCPD SWAT Strike Force officers executed the search warrant at the S&N Store.  Sergeant Thomas supervised the warrant's

execution.  The Strike Force officers used a ram to force open the amusement

machines because the store operator would not provide a key.  Defendant

McCown stayed outside during the warrant execution to preserve his

undercover status. Sergeant Thomas took possession of the money seized from

the S&N Store machines and DCPD's vice unit prepared a seizure report

indicating that $8,633 had been recovered.

Defendant Rose, a vice unit detective, was the lead investigator of

gambling complaints at the Chevron Store.  Defendant Jones, a uniform officer,

assisted Defendant Rose and other detectives investigating that location.

Defendant Jones worked undercover by playing the machines and redeeming

her winning points for store merchandise valuing more than $5.00.  Defendant

Rose obtained the search warrant for the Chevron Store.  On March 12, 2011,

Defendant McCown, Sergeant Thomas, and SWAT Strike Force officers

executed the warrant; Defendant Jones only observed.  Again, Strike Force

officers used a ram to open the machines after the store operator refused to

provide a key.  The officers seized a printer, a receipt/ticket machine and U.S.

currency.  DCPD's vice unit prepared a seizure report indicating that $4,491

was seized at the Chevron Store.

6

In early 2011, Defendant Rose began investigating gambling at the Texaco Store.  He obtained a search warrant from the Magistrate Court for that location after Defendant Jones, again working undercover, played the machines and redeemed her winning points for $8.00 in store credit, which she turned in for store merchandise.  On or about March 4, 2011, several detectives and SWAT Strike Force officers executed the search warrant at the Texaco Store.  Sergeant Thomas supervised execution of the warrant.  After the store clerk refused to provide a key, officers used rams to open nine machines and Thomas took possession of the money recovered.  DCPD's seizure report indicated that $7,206 was seized from the Texaco Store.

Captain Mears testified that practices and procedures for obtaining and executing search warrants are covered in DCPD's 24-week basic training, but not in-depth.  (Mears Depo., [52-2] at 3 of 38.)  He elaborated, "we cover what is required to get a search warrant and how to obtain a search warrant, but [we] don't actually do a practical or anything like that."  (Id. at 4 of 38.)  Captain Means did not recall receiving basic training on how to do inventory following execution of a search warrant.  (Id.)  He testified, however, that DCPD's written Standard Operating Procedures, included in the employee manual, contain

7

information about criteria for obtaining search warrants, parameters for executing search warrants, and how to conduct inventory and return search warrants.  (Id.)

During the relevant time period, Lieutenant Dickerson was commander of the vice unit.  He testified that he and his staff trained officers on how to investigate complaints of illegal gambling and how to obtain search warrants for establishments under investigation.  Dickerson instructed officers that they had to receive at least two cash payouts or prizes valuing more than $5.00 before applying for a search warrant.

## Discussion

Plaintiff alleges that "the decision to search, seize, damage and/or destroy the machines and seize the cash in the machines was unreasonable and in violation of [Plaintiff's] Fourth and Fourteenth Amendment rights to the U.S. Constitution and the laws of the State of Georgia."[3]  (Compl., [1] ¶ 16.) Moving

---

[3] The Court interprets Plaintiff's claim as an action under 42. U.S.C. § 1983, which provides individuals with a "federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States." Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir. 1990) (citations omitted). Although the Complaint mentions "laws of the State of Georgia," no specific laws or state-law causes of action are identified.  Therefore, the Court limits its consideration to Plaintiff's federal constitutional claims.

8

Defendants argue (1) that Defendants McCown and Jones are entitled to qualified immunity against Plaintiff's § 1983 claims because they committed no constitutional violations; and (2) that Defendants DeKalb Police Chief and DeKalb County are entitled to summary judgment because Plaintiff cannot show that the harm complained of was caused by any municipal policy.

## I.      Officer Defendants and Qualified Immunity

### A.      Qualified Immunity Standard

Defendants sued in their individual capacities for discretionary acts are protected from suit by the doctrine of qualified immunity, unless those acts violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority." Cottone v. Jenne, II, 326 F.3d 1352, 1357 (11th Cir. 2003). Once the government official has satisfied this initial burden, "the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." Id. at 1358. The latter part of the analysis is two-pronged. First, the court addresses the threshold question of "whether the plaintiff's allegations, if true, establish a constitutional violation."

9

Id. (internal quotations and citation omitted).  If there is a constitutional violation, the court proceeds to the second step to determine whether that constitutional right was clearly established.  Id.

To demonstrate that a constitutional right was clearly established, a plaintiff must show that "when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful."  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  To determine whether an official would have understood his conduct to be lawful or unlawful, parties and courts must look to case law at the time of the alleged violation. "[T]he salient question is whether the law at the time of the alleged violation gave officials 'fair warning' that their acts were unconstitutional." Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003).  "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."  Post, 7 F.3d at 1557.

    B.    Standards for § 1983 Liability based on Unlawful Search and Seizure

        1.    *Search conducted pursuant to a warrant*

10

Under the Fourth Amendment, "no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." U.S. v. Martinelli, 454 F.3d 1300, 1307 (11th Cir. 2006). But "[w]hen a law enforcement officer seeks summary judgment on the basis of qualified immunity, we only must ask whether, viewing the facts in a light favorable to the non-movant, there was *arguable* probable cause." Swint v. City of Wadley, 51 F.3d 988, 996 (11th Cir. 1995) (internal quotations omitted) (emphasis in original). "Thus, we determine whether reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed." Id. (internal quotations omitted).

"Where [an] alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." Messerschmidt v. Millender, 132 S. Ct. 1235, 1245,

11

__ U.S. __ (2012).  However, the fact that a neutral magistrate issued the warrant "does not end the inquiry into objective reasonableness."  Id.  Rather, the Supreme Court has "recognized an exception allowing suit when it is obvious that no reasonably competent officer would have concluded that a warrant should issue."  Id.

> 2.    *Execution of a Search Warrant*

"[T]he magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances."  U.S. v. Wuagneux, 683 F. 2d 1343, 1352 (11th Cir. 1982).  "While the permissible scope of a search is governed by the terms of the warrant, by the same token a search may be as extensive as reasonably required to locate the items described in the warrant."  Id. (internal citation omitted).  Search warrants need not specify the precise manner in which they are to be executed.  "On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by a warrant – subject of course to the general Fourth Amendment protection against unreasonable

12

searches and seizures." <u>Dalia v. U.S.</u>, 441 U.S. 238, 257 (1979) (internal citation and quotations omitted).

"Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." <u>U.S. v. Ramirez</u>, 523 U.S. 65, 71 (1998).  However, the Supreme Court has recognized that "officers executing search warrants on occasion must damage property in order to perform their duty." <u>Dalia</u>, 441 U.S. at 258.  "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." <u>Ramirez</u>, 523 U.S. at 71 (internal citation omitted).

C.   <u>Application of Legal Standards to Officer Defendants</u>

1.   *Defendant Jones*

The undisputed facts show that Defendant Jones assisted Defendant Rose in investigating gambling complaints at the Chevron and Texaco Stores. Defendant Jones' role was limited to working undercover, playing the machines, and redeeming her winning points at those two locations.  Notably, there is no allegation or evidence in the record – nor does Plaintiff suggest in its

13

response brief – that Defendant Jones participated in any warrant application, search, or seizure.  Therefore, the Court agrees with Moving Defendants that Plaintiff has not shown a Fourth Amendment violation on the part of Defendant Jones and she is entitled to qualified immunity.

2.      <em>Defendant McCown</em>

The undisputed facts show that Defendant McCown's involvement in the events in question was limited to (1) working undercover and playing the machines at the S&N Store; (2) applying for and obtaining the search warrant for the S&N Store from the Magistrate Court; and (3) executing the warrant at the Chevron Store.  Like Defendant Jones, the Court finds that Defendant McCown's actions do not amount to constitutional violations.  Therefore, he too is entitled to qualified immunity.

a.      S&N Store Warrant

After playing the amusement machines at the S&N Store, Defendant McCown personally received at least two cash payouts in excess of $5.00, and he witnessed an informant receive a cash payout over $5.00 at the same store.[4]

---

[4] Under O.C.G.A. § 16-12-35(d)(1), Georgia's gambling prohibition does not apply to a coin operated game or device designed and manufactured for bona fide amusement purposes which involves some skill in its operation and rewards players

14

McCown subsequently presented an affidavit to the Magistrate Court setting forth this evidence of illegal gambling and obtained a search warrant for the store.  (McCown Affid., [37-2] ¶¶ 3-6.)  In its response brief, Plaintiff claims that the search warrants for the *Chevron* and *Texaco* Stores were issued without probable cause, but makes no mention of the S&N Store warrant.  (Pl.'s Resp. Br., [45] at 6-9 of 12.)  As Moving Defendants note, McCown was not involved in obtaining search warrants for the Chevron or Texaco locations.

The Court finds that a reasonable officer in McCown's circumstances could have believed that probable cause existed to support a search warrant for the S&N Store.   Therefore, because McCown had arguable probable cause, he is entitled to qualified immunity from Plaintiff's unreasonable search claim.

b.     Chevron Store Warrant Execution

At the outset, Moving Defendants note that Defendant McCown "assisted in the March 12, 2011 search warrant execution at Chevron," but he "did not physically take possession of any currency or items seized during the warrant

---

exclusively with: free plays; merchandise, prizes or gift certificates worth no more than $5.00; points, tokens, vouchers, or tickets that may be exchanged for free plays or merchandise worth no more than $5.00; or a combination of any of the aforementioned awards.

15

execution." (McCown Affid., [37-2] ¶ 10.) Even if the other officers' conduct

could be attributed to Defendant McCown, however, Moving Defendants

maintain that the seizure did not violate the constitution, let alone any clearly

established rights. The Court agrees with Moving Defendants.

Moving Defendants argue, and Plaintiff does not dispute, that the

Chevron Store warrant authorized the use of force during execution of the

search warrant. The warrant read: "Necessary and reasonable force may be

used to effect an entry into any building or property or part thereof to execute

this search warrant if, after verbal notice, or an attempt in good faith to give

verbal notice, by the officer directed to execute the same of the officer's

authority and purpose: (1) The officer is refused admittance. . . ." (See, e.g.,

S&N Store Warrant, [37-2] at 16 of 19.) Sergeant Thomas testified that the

Chevron Store machines were forced open because the attendant did not have a

key and the owner was unable to come to the scene within a reasonable time.

(Thomas Depo., [52-4] at 21 of 48.)

Plaintiff responds that officers' execution of all three warrants violated

the Fourth Amendment because "the actions of the Strike Force in ramming

and halliganning the machines was plainly unreasonable and unnecessary to the

16

performance of their duty to obtain the money in the machine." (Pl.'s Resp. Br., [45] at 9 of 12.) Plaintiff's cursory argument is not sufficient to defeat Defendant McCown's claim for qualified immunity. Plaintiff has not identified any case law in existence at the time the warrant was executed that would have put McCown on notice that he was violating Plaintiff's clearly established rights. See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.").

Given the scope of the search warrant, officers' general discretion to determine how best to execute a warrant, and Sergeant Thomas's testimony that the officers first tried to obtain a key to the machines, the Court cannot conclude – based solely on Plaintiff's assertion – that the seizure was plainly unreasonable and unnecessary. Therefore, Defendant McCown is entitled to qualified immunity with respect to the Chevron warrant execution.

In sum, Plaintiff has failed to show that Defendant Jones or Defendant McCown violated any clearly established right while performing their discretionary functions. Accordingly, the officers are entitled to qualified

17

immunity and Moving Defendants' motion for summary judgment is

**GRANTED** with respect to these Defendants.

## II.     Supervisory Liability in § 1983 Suits

### A.     Legal Standard for Supervisory Liability

"The Supreme Court has placed strict limitations on municipal liability

under § 1983.  A county's liability under § 1983 may not be based on the

doctrine of respondeat superior."  Grech v. Clayton Cnty., 335 F.3d 1326, 1329

(11th Cir. 2003) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989) and

Monnell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  To establish

municipal liability under § 1983, Plaintiffs must allege facts to show the

*county's* culpability in the alleged constitutional violation.  "A county is 'liable

under section 1983 only for acts for which the county is actually responsible.'"

Id. (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1027 (11th Cir. 2001)).

"Indeed, a county is liable only when the county's official policy causes the

constitutional violation.  Thus, [plaintiffs] must identify a municipal policy or

custom that caused [their] injury."  Id. (internal quotations and citations

omitted).

18

B.    Application of Legal Standard to County Defendants

Plaintiff's suit against the DeKalb County Police Chief in his official capacity is, in effect, a suit against DeKalb County.  Brandon v. Holt, 469 U.S. 464, 471 (1985).  Where suits are brought against both a municipality and an officer in his or her official capacity "there no longer exists a need to bring official capacity actions" because it would be redundant.  Busby v. Orlando, 931 F.2d 764, 776 (11th Cir. 1991).   Therefore, the Court limits its consideration to Plaintiff's allegations against DeKalb County and the DeKalb County Police Chief, in his official capacity, is **DISMISSED** from this action.

Moving Defendants argue that Plaintiff cannot establish that a County policy or custom caused any constitutional violation.  Specifically, Moving Defendants claim that (1) there was no constitutional violation, and therefore, the County cannot be liable under § 1983; and (2) Plaintiff has not produced any evidence that the County "had a policy of not properly training its officers on how to obtain search warrants and how to execute search warrants."  (Def.s' Br., [37-1] at 24-25 of 27.)  Plaintiff responds that (1) the Chevron and Texaco Store search warrants were obtained based on a "long standing policy and practice of DeKalb County which was legally incorrect; i.e., that providing

19

merchandise in excess of $5.00 as winnings on a bona fide coin operated

amusement machine amounts to commercial gambling;"[5] and (2) "DeKalb

County has a policy and practice that allows its Strike Force officers to ram and

Halligan machines, which effectively destroys them, in this situation where

such damage and destruction is not reasonably necessary to the performance of

their duty . . . ." (Pl.'s Resp. Br., [45] at 6 of 12.)

###    1.    *Policy or Custom Regarding Search Warrants*

The Court finds that unresolved factual issues preclude summary

judgment for Moving Defendants on this claim.  Captain Mears, testifying on

behalf of the County, described the County's practice when investigating illegal

---

[5] Effective July 1, 2010, "single play" is defined under O.C.G.A. § 50-27-70(b)(16) as: "the completion of a sequence of a game, or replay of a game, where the player receives a score and from the score the player can secure free replays, merchandise, points, tokens, vouchers, tickets, or other evidence of winnings as set forth in subsection (c) or (d) of Code Section 16-12-35.  A player may, but is not required to, exchange a score for rewards permitted by subparagraphs (A), (B), (C), and (D) of paragraph (d)(1) of Code Section 16-12-35 after each play."

Thus, Plaintiff argues, "the statute provides that if a player of this game plays the game multiple times, the value of the prize can be $5.00 *times the number of the plays*." (Pl.'s Resp. Br., [45] at 8 of 12 (emphasis added).)  Plaintiff's position is supported by Georgia case law.  Ultra Telecom v. State, 701 S.E. 2d 144 (Ga. 2010).  By extension, Plaintiff contends, the search warrants for Chevron and Texaco were issued without probable cause because "statements that a prize of more than $5.00 in merchandise was [awarded] does not allow the fair probability of finding contraband or evidence of a crime at the location." (Id.)

20

gambling complaints: "If [detectives] were to win and receive payouts over $5, they would bring the payout back, place it into evidence, then they would do their case notes about it.  If they received multiple payouts, then they would obtain a search warrant for the location for the crime of commercial gambling . . . ."  (Mears Depo., [38] at 57 of 70.)  Mears clarified that his understanding of DCPD policy was that "if you receive something of value from a store of over $5, . . . that was commercial gambling."  (Mears Depo., [52-2] at 14 of 38.)  Similarly, Moving Defendants' Statement of Undisputed Material Facts says:

> Lieutenant Dickerson was commander of the vice unit
> team during this time period.  Dickerson and his staff
> trained officers on how to investigate complaints of
> illegal gambling.  Dickerson explained what was
> required to obtain a search warrant for the
> establishments.  Dickerson instructed McCown and
> other officers that they had to receive at least two cash
> payouts or prizes valuing more than $5.00 from
> playing the amusement machines prior to applying for
> a search warrant.

(Def.s' SMF, [39] ¶ 14.)

As Plaintiff notes, non-cash payouts of more than $5.00 do not necessarily violate Georgia law.  (See n. 5, supra.)  Undercover detectives or informants receiving more than $5.00 worth of prizes *for a single play* would

constitute evidence of illegal gambling. However, detectives receiving more than $5.00 in prizes for *multiple plays* does not necessarily supply probable cause for a search warrant based on illegal gambling.

Without more specificity regarding the number of plays executed by the investigating officers and informants at the Chevron and Texaco stores, the Court cannot make a determination as to whether a constitutional violation occurred. Based on the facts now before the Court, the County's policy on obtaining search warrants for illegal gambling may have caused a violation of Plaintiff's Fourth Amendment rights. Therefore, Moving Defendants' motion for summary judgment is **DENIED** with respect to this claim.

2. *Policy or Custom Regarding Execution of Search Warrants*

Captain Mears testified about the County's practice for recovering cash from amusement machines suspected of containing illegal gambling proceeds. First, he stated, officers attempt to obtain a key to the machines from the store clerk. (Mears Depo., [38] at 60-61 of 70.) If the clerk does not have a key, the officers attempt to contact the owner. (Id. at 61 of 70.) They inform the owner that the officers have a search warrant to go into the machines and ask the owner to provide a key. (Id. at 61 of 70.) They advise the owner that he has a

reasonable amount of time to produce the key.  (Id.)  Then, if the owner does not arrive within a reasonable time or if the owner refuses to provide a key, the officers force open the machines.  (Id.)  There is no allegation that this procedure was not followed at all three stores.  Captain Mears also testified that it was the County's policy to do as little damage as possible to the machines and use the least invasive method available to recover the bills.  (Mears Depo., [52-2] at 6, 9 of 38.)

First, the Court notes that the County's process for seizing cash from amusement machines appears to comport with the scope of the search warrants issued by the Magistrate Court.  (See Part I.C.2.b, supra.)  While excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, Mears testified that it is the County's policy *not* to cause unnecessary destruction and to use the least invasive means possible to execute the search warrant.  Whether that policy was observed in these particular instances is beyond the scope of the Court's inquiry into the County's liability.

Notably, Plaintiff has failed to identify a contrary County policy that instructs officers to cause excessive or unnecessary damage.  Plaintiff's accusation that "ramming and halliganning the machines was plainly

23

unreasonable and unnecessary" to fulfill the officers' duties in this case is insufficient to establish supervisory liability based on an unconstitutional policy or custom. Therefore, Moving Defendants' motion for summary judgment is **GRANTED** with respect to this claim.[6]

### Conclusion

Based on the foregoing, Moving Defendants' motion for summary judgment [37] is **GRANTED in part and DENIED in part**. Officer Defendants Jones and McCown are entitled to qualified immunity from Plaintiff's § 1983 claims and Defendant DeKalb County Police Chief, in his official capacity, is dismissed from the action as redundant. However, Moving Defendants' motion is denied as to DeKalb County to the extent Plaintiff's claim is based on the County's alleged unconstitutional policy for obtaining illegal gambling search warrants.

The parties shall file a proposed consolidated pretrial order within 30 days of the entry of this Order.

---

[6] While the Court finds that damage to the machines does not give rise to an independent constitutional claim, if it is ultimately established that the machines were searched pursuant to invalid warrants, these facts will be relevant to determining the extent of damages owed to Plaintiff.

24

**SO ORDERED**, this  13th  day of August, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)